UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                                             :
CHI IOTA COLONY OF ALPHA EPSILON PI            :
FRATERNITY, ALEX KHAYCHUK,                     :
KONSTANTIN NOVODORSKY, VITALY                  :
USHRENKO, GENNADY AKSELRUD,                    :
ALEKSANDER BARANOV, DAVID BOROWIK, :          **MEMORANDUM & ORDER**
ROMAN BURTMAN, DANNY KANE, MIKE                :
LANTINO, JOSH MALEK, DANNY                     :          05-CV-2919 (DLI)(MDG)
MARKOWITZ, EVEN MCKIERNAN, RYAN                :
RICHMOND, BILLY RUPPERT, BRIAN                 :
THOMSON, JONATHAN TORRES,                      :
STEVE VERBITSKY, and MOSHE ZEITOUNI,           :
                                                             :
                        Plaintiffs,                          :
                                                             :
                -against-                                    :
                                                             :
CITY UNIVERSITY OF NEW YORK,                   :
MARLENE SPRINGER, CAROL L. JACKSON,            :
and CAROL BROWER,                              :
                                                             :
                        Defendants.                          :
-------------------------------------------------------------x

**DORA L. IRIZARRY, U.S. District Judge:**

This case concerns the constitutional limits of a state university to deny official recognition to an all-male social fraternity group on the basis that such group violates the university's policy against gender discrimination. Before the court is plaintiffs' motion for a preliminary injunction and defendants' cross-motion to dismiss plaintiffs' claims pursuant to Fed. R. Civ. P. 12(b)(6). The court considers plaintiffs' claims, under 42 U.S.C. § 1983, that defendants violated their rights to intimate and expressive association and equal protection. The court also addresses plaintiffs' claim under Title IX of the Civil Rights Act of 1972. The court has received an amici curiae memorandum

1

submitted by the North-American Interfraternity Conference and the National Panhellenic Conference in support of plaintiffs' claims. The court held oral argument on March 1, 2006, during which plaintiffs and defendants agreed that a hearing was unnecessary, and the court considers the record before it sufficient at this time. For the reasons set forth below, the court grants plaintiffs' motion for a preliminary injunction. Defendants' motion to dismiss is denied with respect to plaintiffs' claims of intimate and expressive association but granted with respect to plaintiffs' equal protection and Title IX claims. The claims against Marlene Springer and Carol L. Jackson in their individual capacities, for monetary relief, are dismissed on grounds of qualified immunity.

I.      **Facts**

The individual plaintiffs in this action are male students at the College of Staten Island ("CSI"), a senior college of defendant City University of New York ("CUNY"),[1] who are members of the Chi Iota Colony, a group in the process of becoming a chapter of the international college social fraternity Alpha Epsilon Pi ("AEPi"). The factual background presented herein draws primarily from deposition testimony and declarations from Alex Khaychuk ("Mr. Khaychuk"), one of the named plaintiffs and President of Chi Iota Colony from late spring 2004 to fall 2005.

Plaintiff Chi Iota Colony of AEPi (hereinafter the "Fraternity") was formed around October 2002. Currently, there are eighteen members in the Fraternity, and plaintiffs estimate that the Fraternity is unlikely to exceed fifty members, though there is no set membership limit. (Khaychuk Decl. ¶¶ 14, 23–24.) CSI has an undergraduate student population of around 11,100, approximately

---

[1] CUNY is a public university established under the New York Education Law.

4500 of which are males.[2]  (*See* Galvez Decl. Ex. A.)

Plaintiffs state that the Fraternity's purpose and membership requirements have been established to be consistent with those of AEPi.  (Khaychuk Decl. ¶ 19.)  AEPi, which describes itself as "the Jewish Fraternity of North America" but is "non-discriminatory and open to all who are willing to espouse its purpose and values," was founded in 1913 "to provide opportunities for the Jewish college man seeking the best possible college and fraternity experience."  The Mission Statement of Alpha Epsilon Pi, http://www.aepi.org/information/mission.html (last visited August 11, 2006).  AEPi's basic purpose is enabling "a Jewish man to be able to join a Jewish organization whose purpose is not specifically religious, but rather social and cultural in nature."  (*Id*.)  AEPi associates itself with Jewish organizations such as the Foundation for Jewish Campus Life/International Hillel and the Israel on Campus Coalition.  AEPi Partnerships, http://www.aepi.org/information/partner.html (last visited August 11, 2006).  AEPi has also partnered with the organization "Taglit-birthright israel" to send members on cost-free trips to Israel. (*Id*.)

The Supreme Constitution of AEPi provides that membership in a particular chapter is conferred to "any male student attending the college or university where such chapter is located." (Am. Compl. Ex. 1, art. II § 1(a)(1).)[3]  AEPi's Constitution states as the group's purpose

---

[2] These estimates were provided for fall 2004.  Plaintiffs allege in their complaint that the CSI population is 12,500, but this estimate includes graduate students.  (*See* Galvez Decl. Ex. A.)

[3] In full, this subsection states:

A chapter - such membership may be conferred by secret individual ballot of the members of the chapter, *upon any male student attending the college or university where such chapter is located*, who is in good standing at and pursuing a course leading to a degree from the college or university, believes in God, has been

3

. . . to promote and encourage, among its members:

Personal perfection, a reverence for God and an honorable life devoted to the ideal of service to all mankind; lasting friendships and the attainment of nobility of action and better understanding among all faiths;

The pursuits of those benefits which derive from vigorous participation in university and college activities and from pleasant application to literary, cultural and general social undertakings; and

The unbiased judgment of our fellows, not by their rank nor worldly goods, but by their deeds and their worth as men.

(*Id*. pmbl.)  The Fraternity's bylaws present the following purpose:

To foster and promote brotherly love, to inaugurate a spirit of cooperation and helpfulness, to create a better understanding among our brothers, [and] to encourage vigorous participation in university, college and general activities in our community, to the mutual advantage of all concerned . . . .

(*Id*. Ex. 2 pmbl.)  Plaintiffs further describe the Fraternity's purpose as achieving a "lifelong interpersonal bond termed brotherhood," which "results in deep attachments and commitments to the other members of the Fraternity among whom is shared a community of thoughts, experiences,

---

previously pledged by the chapter and who has complied with all the requirements of the chapter and Supreme Board of Governors, each chapter determining for itself whether such election shall be by a unanimous vote of the members of the chapter or with negatives [sic] votes not exceeding 10% of its members; provided, however, that any chapter shall have the discretion to require up to three (3) negative votes for such an election; *provided, however, the Supreme Board of Governors shall be empowered to waive and/or suspend such requirements to comply with the rules, regulations and declarations of the administrators of the college or university where any such chapter or colony is located or to be located* [emphasis added.]

Defendants' counsel asked Mr. Khaychuk at his deposition whether the last portion of this provision would mean that plaintiffs could request AEPi to waive and/or suspend the male requirement in order to comply with CSI's rules.  Mr. Khaychuk replied that he did not believe that this requirement was waivable.  (Khaychuk Dep. at 83–84.)  There has been no comment directly provided by AEPi.  Nevertheless, this matter of contract interpretation is not addressed herein, as it is outside the scope of determining, for the instant motion, whether a preliminary injunction is warranted on the theory that CSI's policies violate plaintiffs' constitutional rights.

beliefs and distinctly personal aspects of their lives." (Khaychuk Decl. ¶¶ 32–33.) Plaintiffs explain that "[t]he single-sex, all-male nature of the Fraternity is essential to achieving and maintaining the congeniality, cohesion and stability that enable it to function as a surrogate family and to meet social, emotional and cultural needs of its members. Furthermore, non-platonic, *i.e.*, romantic relationships between members and the inevitable jealousies and other conflicts would pose a grave threat to the group's brotherhood, thus, maintaining the Fraternity's brotherhood is best achieved by maintaining an all-male membership." (*Id.* ¶¶ 34–35.)

Plaintiffs acknowledge that there have been at least two bisexual members in the Fraternity, though, to their knowledge, there have never been any homosexual members. Mr. Khaychuk explains that potential members are asked about their sexual orientation, partly to gather facts about the individual and partly because it may affect the individual's fitness to become a member, though sexual orientation may or may not affect the individual's chances at receiving a bid. It is unclear when the two members may have indicated to others that they were bisexual. (Khaychuk Dep. at 87–97.) Mr. Khaychuk explains that, had he known that there were bisexual members in the Fraternity, it "might have made [him] uncomfortable" but that he did not know whether it would have affected his choice to join the Fraternity. (*Id.* at 108.) Mr. Khaychuk was asked whether admitting a lesbian would be acceptable to the Fraternity, as the chance of romantic relationships or jealousies would presumably be eliminated, to which he replied that "[h]aving a female in the fraternity is an issue itself" and that a lesbian is "still a female." (*Id.* at 103–04.) Mr. Khaychuk further explains that a man "could be close to a female as friends, but in a fraternity it's a different kind of bond." (*Id.* at 138.) Mr. Khaychuk testified that there are certain matters he might share with a fellow member, or "brother," in the Fraternity that he would not share with his family and vice

versa.  (*Id*. at 145.)

When asked whether the Fraternity expresses any kind of public message, Mr. Khaychuk replied that the group's public message is that it is a "predominantly Jewish male fraternity." (Khaychuk Dep. at 120.)  Mr. Khaychuk explains that, in private meetings, the Fraternity members "are not extremely religious, but [they] do talk about things that [they] contribute to the community, an expression of Judaism."  (*Id*. at 124.)  Members sometimes wear t-shirts identifying themselves as members of AEPi.  The Fraternity receives assistance from the AEPi national organization, for example concerning member recruitment and running the Fraternity, and sometimes receives visits from an AEPi national advisor.  (*Id*. at 152.)

In accordance with the mission and purposes of the Fraternity, in evaluating prospective members, the Fraternity considers congeniality, social compatibility, and the man's level of interest in joining the Fraternity, potential for loyalty and commitment to AEPi and its purposes, existing relationships with members, character, and potential for affection, admiration, cooperation, and respect among members.  (Khaychuk Decl. ¶ 38.)  Neither the Fraternity nor AEPi requires members to be Jewish, and the Fraternity does have non-Jewish members, but Mr. Khaychuk remarks, "We explain to the rushes that we're a Jewish fraternity, and what we stand for.  If they're okay with that, then obviously they accept that we're a Jewish fraternity, and then we just look for the qualities that they would better us as a fraternity."  (Khaychuk Dep. at 69.)  However, Mr. Khaychuk also comments that extending bids to non-Jewish potential members has been "an issue with some brothers" in the Fraternity.  (*Id*. at 75–76.)  Membership is for life, unless a member is expelled for disciplinary reasons.  No man who is a member of another college social fraternity may become a member of AEPi.

Individuals become members of the Fraternity through processes known as "rush" and "pledging." Plaintiffs define "rush" as the "process by which a fraternity group communicates with prospective members and recruits and selects new members and during which prospective members evaluate the group and their own interest in joining." (Khaychuk Decl. ¶ 27.) Plaintiffs define "pledging" as the "period of transition between (a) the acceptance of an invitation to membership in a fraternity chapter/colony and (b) the conferral of full membership." (*Id.* ¶ 28.) Pledging, which occurs twice per year, lasts one to five weeks. During this time, transitional members, or "pledges," get to know one another and the members and, through weekly meetings conducted by a "pledge master," are taught about and tested on AEPi's history, purposes, and values. (*See* Khaychuk Dep. at 35–37, 111–14, 133.) AEPi's Constitution provides:

> The course of pledge training may include duties about the house and other duties for the chapter, but shall not include any personal service for members of the chapter or visiting alumni. Extra pledge duties may be imposed as discipline, but no pledge shall be subject to corporal punishment of any kind. Practices which have been known as "Hell Week" and any similar practices are strictly forbidden.

> No pledge shall be subject to paddling or any other form of corporal punishment or be placed in physical peril. Undignified methods, either private or public, such as quests, treasure hunts and road trips are specifically prohibited.

(Am. Compl. Ex. 1, art. XII §§ 1–2.)

Plaintiffs explain that selectivity in membership is achieved through several steps involving mutual decisions by the Fraternity and potential members. During rush, members will extend an invitation to attend a rush event to around ten percent of men they meet on CSI's campus, and around one third of such men have become acquainted with members through attending Hillel or Jewish Awareness Movement activities. Most, but not all, of such men are invited to attend additional rush events, and not all invited men return. During the rush process, each prospective

member goes through a structured interview during which he is asked about his interest in joining the Fraternity, family and personal life, academic and career plans, religion and attitude towards religion, views on social issues, and what he seeks from membership in the Fraternity. The majority of men who attend repeated rush events are asked to join the Fraternity, and the final decision offering each bid is made by a member of the Fraternity's executive committee after discussion with all members, ensuring that serious dissent is not expressed by more than one member. As an example, around eight to twelve men per semester might be asked to join the Fraternity and start the pledging process.[4] Of these, around six to ten might decide to go through pledging, and around five to six might be initiated as members. Sometimes, a pledge may drop out or, occasionally, the Fraternity "depledges" a man, i.e., halts the membership process with him. (Khaychuk Reply Decl. ¶¶ 9–15.)

As a group, plaintiffs participate in a variety of activities, both with and without non-members, and ranging from formal to informal. The Fraternity excludes non-members from "meetings at which it discusses whether to offer membership to a man; meetings at which the ceremony commencing pledgeship is performed; meetings at which the ceremony initiating a man into full membership is performed; meetings at which it considers terminating a man's membership; and from certain other business meetings." (Khaychuk Decl. ¶ 40.) The initiation ceremony includes rituals about which only members are allowed to know. (Khaychuk Dep. at 39.) On a given week, around half of the Fraternity members, including those who are not Jewish, attend a weekly meeting with a Rabbi organized by the Jewish Awareness Movement at CSI. Once, during pledging,

_____

[4] Mr. Khaychuk testified at his deposition that having fifty pledges was a "goal[]." (Khaychuk Dep. at 158.)

pledges built a sukkah,[5] which Mr. Khaychuk testified was part of the Fraternity's expression of its Jewish message, with another Jewish campus group. Another time, the Fraternity invited the Rabbi from the Jewish Awareness Movement to speak about Israel at one of the Fraternity's meetings. Plaintiffs occasionally have social parties to which they invite non-members. These parties are publicized by word of mouth and flyers. (*Id*. at 113, 120–21, 124–25, 127.) Plaintiffs further describe the nature of their activities as follows:

> While social events to which we invite non-members are certainly a part of our activities, since one purpose of a social fraternity is to develop a variety of social skills, they are not a major part of our activities, occurring perhaps once or twice a month. In contrast, we have our colony business meetings weekly and less formal gatherings of the members (brothers) on at least a weekly basis and often more than once a week. In addition, through much of the semester, there are activities involving the teaching of, and getting to know, the pledges on a weekly basis or more frequently, and a community service event an average of one per semester. As should be apparent, social events to which we invite non-members are a minority of our activities.

(Khaychuk Reply Decl. ¶ 8.)

On or about March 3, 2004, the Fraternity applied to be chartered and officially recognized by CSI. By memorandum dated March 29, 2004, Carol Brower, Director of the Office of Student Life at CSI, denied the Fraternity's application because it did not comply with CSI policy: "Membership in a chartered club must be open to all students. Because your constitution appears to exclude females, it contravenes the College's non-discrimination policy. . . . In addition, I note that your proposed constitution provides for the practices of rushing and pledging. College policy

---

[5] A sukkah is a "a booth or shelter with a roof of branches and leaves erected near a home or in or near a synagogue and used esp. for meals and for temporary residence during the celebration of the Sukkoth festival," which is "a Jewish religious festival of thanksgiving celebrated orig. as an autumn harvest festival that is commemorative of the temporary shelters of the Jews during their wandering in the wilderness." WEBSTER'S THIRD NEW INT'L DICTIONARY 2287 (2002).

. . . prohibits rushing and pledging." (Am. Compl. Ex. 6.) CSI delineates the following policies in

its "Club Chartering Packet":

> In order for an organization to be officially recognized at the College of Staten Island, membership and participation in it must be available to all eligible students of the College. In addition, in order to be recognized, each organization must agree not to discriminate on the basis of age, alienage or citizenship, color, *gender*, differing ability, national or ethnic origin, race, religion, sexual orientation, veteran or marital status, or social class.
>
> Furthermore, the practices commonly referred to as pledging and rushing are not permitted.

(*Id*. Ex. 5 at 6 (emphasis added).)

The benefits and privileges that CSI confers to recognized student organizations include the

use of CSI's facilities, services, bulletin boards, and centralized mailbox; the opportunity to apply

for special funding through the CSI Student Government or to solicit contributions outside of CSI;

the right to use the CSI name in conjunction with the organization's name; the inclusion of events

in monthly calendars and the ability to arrange news coverage through the Office of Student Life;

the use of workspace in the Campus Center or meeting space in CSI's academic buildings; and

eligibility for insurance through the CSI Association. (Am. Compl. Ex. 5 at 3.) Plaintiffs explain

that denial of official recognition has precluded them from setting up tables at new student

orientations, receiving funds from CSI, and being able to hang banners or chalk announcements on

campus. Plaintiffs claim that they were specifically prohibited from handing out flyers to students

on campus. Plaintiffs explain that having to hold meetings off-campus has caused difficulty for

students who depend on public transportation. (Khaychuk Reply Decl. ¶¶ 3–5. )[6]

---

[6] Mr. Khaychuk explained that recognition is likely necessary to become an official chapter of AEPi, though he was not completely sure and the court has no further information. (Khaychuk Dep. at 153.)

More than a year after the denial of the club chartering application, plaintiffs filed the instant action on June 17, 2005, claiming, under 42 U.S.C. § 1983, that the defendants have violated their rights to intimate and expressive association and equal protection. Plaintiffs move for a preliminary injunction on these claims, "requiring [d]efendants . . . to recognize the Fraternity on behalf of CSI, to grant the Fraternity a charter and all the rights and privileges accorded recognized/chartered student organizations at CSI, and to refrain from discriminating against [p]laintiffs on the basis of their membership practices or on any other unlawful basis." (Am. Compl. ¶ 142.) Plaintiffs also seek monetary and injunctive relieve under 42 U.S.C. § 1983 against CSI President Marlene Springer ("Springer") and Carol L. Jackson ("Jackson"), Vice President for Student Affairs at CSI, in their individual capacities, for alleged violations of plaintiffs' constitutional rights. Plaintiffs' last remaining claim[7] is that defendants violated Title IX of the Civil Rights Act of 1972, 20 U.S.C. § 1681(a). Defendants cross-move to dismiss plaintiffs' claims under Fed. R. Civ. P. 12(b)(6).

## II.    Motion to Dismiss Standard

In analyzing the plaintiffs' motion for a preliminary injunction below, the court also considers defendants' cross-motion to dismiss.

A motion to dismiss under Fed. R. Civ. P. 12(b)(6), for "failure to state a claim upon which relief can be granted," must be denied "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957). The court must accept as true all well-pleaded factual

---

[7] By Memorandum and Order dated December 22, 2005, the court dismissed plaintiffs' state law claims that defendants violated the New York State Constitution, Public Accommodation Act, and Anti-Discrimination Act.

allegations and draw all reasonable inferences in the plaintiff's favor. *E.g.*, *Dangler v. New York City Off Track Betting Corp.*, 193 F.3d 130, 138 (2d Cir. 1999).

## III.    Preliminary Injunction Standard

A party seeking a preliminary injunction must show "(1) that it will be irreparably harmed if an injunction is not granted, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of the hardships tipping decidedly in its favor." *Bronx Household of Faith v. Bd. of Educ. of the City of New York*, 331 F.3d 342, 348–49 (2d Cir. 2003). Where, as in the present case, a mandatory injunction is sought, i.e., one that seeks to alter rather than maintain the status quo, a heightened showing of "clear" or "substantial" likelihood of success on the merits is required.[8] *E.g.*, *id.* at 349; *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996).

---

[8] Plaintiffs do not dispute that the injunction sought is a mandatory injunction. To the extent plaintiffs argue that an exception to the heightened standard exists for "a constitutionally based preliminary injunction against an educational entity's policy that affects the group's ability to operate" (Pls.' Mem. at 14)—based on *Deeper Life Christian Fellowship, Inc. v. Bd. of Educ. of the City of New York*, 852 F.2d 676 (2d Cir. 1988) and *Hsu v. Roslyn Union Free Sch. Dist.*, 85 F.3d 839 (2d Cir. 1996)—the court finds nothing in *Deeper Life* or *Hsu* announcing such a rule or indicating that the heightened standard should not apply in the instant case.

## *Irreparable Harm*

Plaintiffs argue that irreparable harm should be presumed because they have alleged violations of their constitutional rights. The Second Circuit has made clear that there is no automatic presumption, distinguishing between whether "the challenged government action directly limit[s]" or "only potentially affect[s]" the plaintiff's constitutional rights. *See Bronx Household*, 331 F.3d at 350. While irreparable harm may be presumed in the former situation, it is not in the latter situation because of the lack of a causal link. The Second Circuit emphasizes that "a party must articulate a 'specific present objective harm or a threat of specific future harm.'" *Id*. (quoting *Laird v. Tatum*, 408 U.S. 1, 92 S. Ct. 2318, 33 L. Ed. 2d 154 (1972)).

Here, as in *Bronx Household*, there is a sufficient causal link because the violation of First Amendment rights[9] alleged by plaintiffs "results directly" from defendants' policy denying official recognition to organizations that discriminate on the basis of gender. *See* 331 F.3d at 350. Irreparable harm may thus be presumed. Defendants' argument that constitutional harm is lacking because the Fraternity has already existed independent of official recognition has been rejected by the Supreme Court. *See Healy v. James*, 408 U.S. 169, 183, 92 S. Ct. 2338, 33 L. Ed. 2d 266 (1972) ("the group's possible ability to exist outside the campus community does not ameliorate significantly the disabilities imposed by the President's action [in denying official campus recognition]"). With irreparable harm presumed, the court next addresses whether there is a "clear" or "substantial" likelihood of success on the merits.

---

[9] The court does not address irreparable harm with regard to plaintiffs' equal protection and Title IX claims, as these claims are dismissed under Fed. R. Civ. P. 12(b)(6), *infra*.

## IV.     Freedom of Association

"While the freedom of association is not explicitly set out in the [First] Amendment, it has long been held to be implicit in the freedoms of speech, assembly, and petition." *Healy*, 408 U.S. at 182.  The Supreme Court distinguishes between "freedom of intimate association," which concerns protecting "choices to enter into and maintain certain intimate human relationships . . . against undue intrusion by the State," and "freedom of expressive association," which involves the "right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Roberts v. United States Jaycees*, 468 U.S. 609, 617–18, 104 S. Ct. 3244, 82 L. Ed. 2d 462 (1984). Plaintiffs have asserted claims under both of these associational rights.[10]  "[W]hen the State interferes with individuals' selection of those with whom they wish to join in a common endeavor, freedom of association in both of its forms may be implicated." *Id*. at 618; *see also Bd. of Directors of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 544, 107 S. Ct. 1940, 95 L. Ed. 2d 474 (1987) ("In many cases, government interference with one form of protected association will also burden the other form of association.").

If the court finds that a group warrants constitutional protection as an intimate or expressive association, the court must then determine whether the group is being subjected to "unjustified government interference." *See Louisiana Debating & Literary Ass'n v. City of New Orleans*, 42 F.3d 1483, 1498 (5th Cir. 1995) (quoting *Duarte*, 481 U.S. at 544).  Intrusion on a group's freedom

---

[10] Though plaintiffs also list "freedom of speech" in their Amended Complaint, they do not specifically address "speech" other than through arguments concerning the rights to intimate and expressive association.

of association is subject to strict scrutiny, and "[i]nfringements . . . may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Roberts*, 468 U.S. at 623; *see also Louisiana Debating*, 42 F.3d at 1498.

### *Intimate Association*

The right to intimate association stems from the concept of personal liberty and "reflects the realization that individuals draw much of their emotional enrichment from close ties with others." *Roberts*, 468 U.S. at 619. Courts have most readily afforded the right to intimate association to relationships centered around family, marriage, the raising of children, and the cohabitation among relatives. *See id.* These relationships are

> distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship. As a general matter, only relationships with these sorts of qualities are likely to reflect the considerations that have led to an understanding of freedom of association as an intrinsic element of personal liberty. Conversely, an association lacking these qualities—such as a large business enterprise—seems remote from the concerns giving rise to this constitutional protection.

*Id*. at 620. Given the grey area between these polar examples given by the Court, each relationship must be scrutinized to determine where its "objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments." *Id*.; *see also Duarte*, 481 U.S. at 545 ("We have not attempted to mark the precise boundaries of this type of constitutional protection. . . . Of course, we have not held that constitutional protection is restricted to relationships among family members."). Factors to be considered "include size, purpose, policies, selectivity, congeniality, and other characteristics that in a particular case may be pertinent." *Roberts*, 468 U.S.

at 620.

Under consideration in *Roberts* was a challenge by the United States Jaycees ("Jaycees") to Minnesota's Human Rights Act, which prohibited discrimination based on gender in places of public accommodation.[11] At the time, regular membership in Jaycees was limited to young men between ages 18 and 35. Jaycees claimed that application of the Minnesota Human Rights Act violated its freedom of association. The Court held that Jaycees was not an intimate association entitled to constitutional protection, noting that local chapters of Jaycees were large (400 members, for example) and unselective because "new members [were] routinely recruited and admitted with no inquiry into their backgrounds." *Roberts*, 468 U.S. at 621. The Court found Jaycees chapters so unselective that "a local officer testified that he could recall no instance in which an applicant had been denied membership on any basis other than age or sex." *Id*. Finally, the Court remarked that "numerous non-members," including women, participated regularly in "a substantial portion of activities central to the decision of many members to associate with one another, including many of the organization's various community programs, awards ceremonies, and recruitment meetings." *Id*. Thus, the Court concluded, "much of the activity central to the formation and maintenance of the association involves the participation of strangers to that relationship. Accordingly, we conclude that the Jaycees chapters lack the distinctive characteristics that might afford constitutional protection to the decision of its members to exclude women." *Id*.

In another key decision, *Duarte*, *supra*, the Court held that California's Unruh Civil Rights

---

[11] The Court found that Jaycees was a "place of public accommodation" within the meaning of the Act, which the Court noted was "an example of public accommodations laws that were adopted by some States beginning a decade before enactment of their federal counterpart, the Civil Rights Act of 1875." *Roberts*, 468 U.S. at 624.

Act did not violate local Rotary Clubs' freedom of association by requiring them to admit women, contrary to international club policy. The Court found that local Rotary Clubs were not intimate associations based on findings that (1) despite varied size from 20 to 900, there was "no upper limit" on membership, (2) clubs focused on "inclusive, not exclusive" membership policies, since clubs were instructed to "keep a flow of [membership] prospects coming" in order for there "to be a true cross section of the business and professional life of the community," (3) although membership was granted by committees, with a final decision by a club's board of directors, clubs were instructed to grant membership to "all fully qualified prospective members within [their] territor[ies]" and "maintain a membership growth pattern," (4) many of the clubs' "central activities [were] carried on in the presence of strangers," since members of any other Rotary Club were to be admitted by the local club and members were encouraged to invite business associates and competitors to meetings, and (5) local clubs often sought news coverage or joint meetings or activities with other organizations. *Duarte*, 481 U.S. at 546–47. The Court found that "[i]n sum, Rotary Clubs, rather than carrying on their activities in an atmosphere of privacy, seek to keep their windows and doors open to the whole world." *Id*. at 547 (internal quotation marks and citation omitted).

In contrast, in *Louisiana Debating*, *supra*, the Fifth Circuit found that four private clubs in New Orleans were intimate associations. The clubs had a "purely social purpose" and selected members based on "character, relationships and acquaintances, congeniality, and compatibility." 42 F.3d at 1496. In granting intimate association status, the Fifth Circuit noted that (1) the clubs' admission processes were especially restrictive, since only existing members could propose new members, admission decisions were subject to vote by the general membership, and only three to five objections would preclude membership, (2) non-members were excluded from the clubs' facilities,

17

which were not identified to the public by any signs, except for extremely limited guest policies,[12] and (3) each club had upper limits on membership, for both residents and non-residents, with the Boston Club having the highest limits of 600 residents and 400 non-residents.

Plaintiffs' organization is equipoised between two extremes, as it is neither as unselective as the groups in *Roberts* or *Duarte* nor as closed to the public as the clubs in *Louisiana Debating*. The only case addressing whether a fraternity (or sorority) qualifies as an intimate association is *Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh*, 229 F.3d 435 (3d Cir. 2000). In this case, the University of Pittsburgh took away the fraternity's status as a recognized student organization when four members were arrested for possession of controlled substances, including heroin, cocaine, opium, and Rohypnol. The Third Circuit held that the fraternity did not warrant classification as an intimate association, justifying its decision as follows:

> [A] range of 20 to 80 members would put the Chapter within the same size range as the local Rotary Clubs that the Court held did not engage in intimate association in *Duarte* . . . . Furthermore, the Chapter actively recruits new members from the University population at large and it is not particularly selective in whom it admits. The international organization of Pi Lambda Phi strongly encourages its chapters to

_____

[12] The Fifth Circuit noted the following:

> Louisiana Debating prohibits its members from bringing or inviting any male guests, at any time and under any circumstances. Female guests are permitted rarely, but usually, they are the members' wives. At the Boston and Stratford Clubs, male residents of the City are strictly prohibited from attending as guests; women and children residents may be accompanied by a member, but on extraordinary occasions; the inviting of male nonresidents is strictly limited according to the time, frequency, and occasion of the visit. The Pickwick Club permits nonresident males to attend as guests during the noonday meals, provided the guest is a friend or close relative of the member and has some basis for a social acquaintance with other members; women and resident males are permitted, but only at limited times and with the approval of the club's Board of Governors.

*Louisiana Debating*, 42 F.3d at 1496–97.

recruit new members aggressively so as to continue the growth of the organization. The Chapter also invites members of the public into its house for social activities and participates in many public University events. All of these elements—the Chapter's size, lack of selectivity, and lack of seclusion in its activities—support our conclusion that the Chapter lacks the essential characteristics of constitutionally protected intimate association.

*Pi Lambda Phi*, 229 F.3d at 442.

However, the Third Circuit's decision does not give the court clear direction, particularly since the Supreme Court has not established a bright line test when considering a group's size. In determining whether a group is intimate, the court should look at how small it is numerically in comparison to the potential pool of applicants. Indeed, "a club in a large city, such as New York, 'with over 400 members may still be relatively intimate in nature, so that a constitutional right to control membership takes precedence' over the city's attempt to ban discrimination within the club." *Louisiana Debating*, 42 F.3d at 1497 n.28 (quoting *New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 19, 108 S. Ct. 2225, 101 L. Ed. 2d 1 (1988) (O'Connor, J., concurring)); *see also Roberts*, 468 U.S. at 620 ("We need not mark the potentially significant points on this terrain with any precision. We note only [the relevant factors, including size] . . . .)." Furthermore, the Third Circuit did not explain why it ascribed a "lack of selectivity" to the fraternity.

These factors make the present case distinguishable from *Pi Lambda Phi* and tip the scale towards "clear" or "substantial" likelihood of success on the merits on a finding that the Fraternity qualifies as an intimate association. Viewing all the relevant factors, the Fraternity has met its burden for a preliminary injunction on this question.

With eighteen current members and a potential membership of fifty, out of an approximate CSI undergraduate student population of 11,100 and male population of 4500, the Fraternity's size

is relatively small. Though plaintiffs admit that the Fraternity technically has no set membership limit, a group's failure to choose a numerical maximum, by itself, does not weigh against intimate association status. Indeed, when the Court noted in *Duarte* that the Rotary Clubs had no upper limit, the focus was more on a lack of selectivity than on the need for a numerical cutoff. *See* 481 U.S. at 546–47.

Plaintiffs noted at oral argument that fraternities and sororities are generally portrayed as and criticized for being exclusive and selective. While the court in *Pi Lambda Phi* did not describe why it did not find the fraternity selective, in the case at bar, plaintiffs have provided several details regarding the Fraternity's selectivity in membership. Similar to the clubs in *Louisiana Debating*, only members of the Fraternity may make decisions regarding new members. It is primarily members who invite individuals to attend rush events, and such invitations are only extended to approximately ten percent of the men a given member meets. From rush onwards, the pool is significantly whittled down to a smaller group of pledges and final members. Unlike the Jaycees in *Roberts*, where gender and age requirements seemed to be the only factor ever precluding membership, the Fraternity screens potential members through a formal process with an emphasis on social and philosophical compatibility with existing members. *See* 468 U.S. at 621. The Fraternity does not have the "inclusive, not exclusive" membership policies that contributed to the finding that the Rotary Clubs were not entitled to protection as intimate associations. *See Duarte*, 481 U.S. at 546. Also, like the *Louisiana Debating* clubs, membership decisions in the Fraternity are considered by the general membership. Mr. Khaychuk explained that serious dissent from even one member of the Fraternity could be grounds for denial of membership; such an obstacle to membership reflects at least a similar level of selectivity as exercised by the clubs in *Louisiana*

*Debating*, where three to five objections would preclude membership. Notwithstanding the fact that the clubs in *Louisiana Debating* were larger, and hence three to five objections would be a small percentage, the fact that serious dissent by one member of the Fraternity could preclude membership is evidence of the Fraternity's functioning as a close-knit, selective group.

With regard to seclusion in activities central to the group's purposes, plaintiffs explain that social events to which non-members are invited are not the focus of the Fraternity's activities. The Fraternity excludes non-members from initiation and pledgeship ceremonies, which include secret rituals, and weekly business meetings.[13] One or more of these activities occur every week in contrast to the social parties, which occur around twice per month. The weekly members-only meetings and shared rituals are activities central to the Fraternity's purposes of brotherhood, congeniality, functioning as a surrogate family, and sharing a community of thoughts, experiences, and beliefs. The Fraternity contrasts with the Jaycees in *Roberts* and the Rotary Clubs in *Duarte*, where the clubs' activities were rife with non-member participation, though admittedly the Fraternity is not as secluded in its activities as the clubs in *Louisiana Debating*.

The court in *Pi Lambda Phi* did not mention or assess the fraternity's purposes in finding that it was not an intimate association. Though the Court in *Roberts* included "congeniality" as a factor that could bear on intimate association status, *see* 468 U.S. at 620, subsequent Supreme Court decisions have not explored the contours of this factor.[14] The Fraternity's central purposes are not

_____

[13] The record is somewhat unclear whether non-members are excluded from all of the business meetings. (*Compare* Khaychuk Decl. ¶ 40 *with* Khaychuk Reply Decl. ¶ 8.)

[14] In *City of Dallas v. Stanglin*, the Court considered the constitutionality of a Dallas, Texas ordinance that limited admission to certain dance halls to individuals between ages 14 and 18. After finding that a group of dance hall patrons, consisting of around 1000 strangers on a particular night, did not qualify as an intimate association, the Court, in discussing whether such a group would

unlike those of the clubs in *Louisiana Debating*, which were described as follows:

> The Clubs' members share common social interests and backgrounds; often, the relationships predate membership in the Clubs through either family, religious activity, or other social groups. The criteria the Clubs use in selecting members include character, relationships and acquaintances, congeniality, and compatibility. Thus, a close nexus exists between the Clubs' purposes and membership criteria.

42 F.3d at 1496. Defendants suggest that the Fraternity's participation in community and social events and its identification with Jewish culture should remove it from intimate association status. However, as has been described above, like in *Louisiana Debating*, there is a "nexus" between the Fraternity's central purposes—including brotherhood and congeniality—and its "membership criteria." *See id*.

Under the totality of circumstances, considering the Fraternity's relatively small size, exclusivity in membership, and seclusion in activities central to the group's purposes, plaintiffs have shown "clear" or "substantial" likelihood of success on the merits that the Fraternity qualifies as an intimate association.

The court next considers whether the state action by CSI survives strict scrutiny. The parties' arguments both in their memoranda of law and at oral argument focused on CSI's non-discrimination policy as applied to the Fraternity. With regard to CSI's blanket prohibition against "rushing" and "pledging," nowhere in their papers do defendants set forth any justification or purpose for this

---

qualify as an *expressive* association, noted, "we do not think the Constitution recognizes a generalized right of 'social association' that includes chance encounters in dance halls." 490 U.S. 19, 25, 109 S. Ct. 1591, 104 L. Ed. 2d 18 (1989). The Second Circuit imported this language in addressing the right to intimate association in *Sanitation & Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 996 (2d Cir. 1997). However, it appears that, given the listing of "congeniality" as a factor in *Roberts*, and the reference in *Stanglin* relating to freedom of *expressive* association, social groups are not necessarily excluded from being considered intimate associations. *See Louisiana Debating*, 42 F.3d at 1497–98 (purely social clubs found to be intimate associations).

prohibition.  Based on plaintiffs' definitions of "rushing" and "pledging," it appears that these terms are simply names given to the Fraternity's member recruitment phases; thus, rushing and pledging are activities that are inseparable from the Fraternity's existence.  CSI does not have a compelling interest in preventing student groups from forming.  The non-discrimination policy, rather than the prohibition against rushing and pledging, is the critical state action at stake in this case that shall be evaluated.

There is undoubtedly a compelling interest in eradicating discrimination based on gender, as reflected in laws such as Title VII and the public accommodations laws that the Court has emphasized serve compelling interests in decisions such as *Roberts* and *Duarte*.  *See, e.g.*, *Duarte*, 481 U.S. at 549 ("public accommodations laws 'plainly serv[e] compelling state interests of the highest order'") (quoting *Roberts*, 468 U.S. at 624).  CSI's policy that "in order to be recognized, each organization must agree not to discriminate on the basis of . . . gender" articulates a compelling interest similar to gender antidiscrimination laws.  A state higher educational institution has a compelling interest in ensuring males and females equal access to student groups.

However, fraternities and sororities have long-standing traditions of single-sex membership at educational institutions throughout the United States.  Fraternities and sororities, with their focus on promoting brotherhood and sisterhood, are distinguishable from other student groups centered on non-gender-based interests such as politics, the environment, music, or languages, where the state institution's compelling interest in eliminating gender discrimination would clearly override such a group's interest in limiting membership to one gender.  There is no law deeming single-sex organizations per se unconstitutional or against national policy.  On the contrary, in support of their preservation, fraternities, sororities, and certain other single-sex organizations have been specifically

excluded from federal gender antidiscrimination legislation. For example, Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." But § 1681 does not apply to the membership practices "of a social fraternity or social sorority which is exempt from taxation under section 501(a) of Title 26, the active membership of which consists primarily of students in attendance at an institution of higher education." 20 U.S.C. § 1681(a)(6)(A). Also excluded from § 1681 are "the Young Men's Christian Association, Young Women's Christian Association, Girl Scouts, Boy Scouts, Camp Fire Girls, and voluntary youth service organizations which are so exempt, the membership of which has traditionally been limited to persons of one sex and principally to persons of less than nineteen years of age." *Id*. § 1681(a)(6)(B).

Legislative history reveals that the exception for fraternities, sororities, and other traditionally single-sex organizations was originally not included in Title IX of the Education Amendments of 1972 and was added specifically in 1974 to protect these organizations. Former U.S. Senator Birch Bayh of Indiana, who was the "author and prime Senator sponsor" of Title IX, explained the importance of the exception for fraternities and sororities when Title IX was amended in 1974:

> It was brought to my attention that under the proposed guidelines, the traditional practice of many colleges and universities whereby social fraternities and sororities receive relatively low rent for housing facilities was in jeopardy due to the [T]itle IX restriction on educational institutions giving any substantial support to any organization which discriminates on the basis of sex.
>
> . . . .
>
> . . . [I]t was not my intent, and I do not believe that it was the intent of the Congress that [T]itle IX be extended to organizations such as social fraternities and sororities. . . .

. . . .

> . . . I think it is important to point out that this exemption covers only social Greek organizations; it does not apply to professional fraternities or societies whose admissions practices might have a discriminatory effect upon the future career opportunities of a woman.

120 Cong. Rec. 39992 (1974).  Senator Bayh wrote in a letter to then Secretary of the Department of Health, Education, and Welfare, Caspar Weinberger, that "[f]raternities and sororities have been a tradition in the country for over 200 years.  Greek organizations . . . must not be destroyed in misdirected effort to apply Title IX."  *Id*. at 39993.

Also instructive is legislation exempting fraternities and sororities from investigation by the United States Commission on Civil Rights: "Nothing in this chapter or any other Act shall be construed as authorizing the Commission, its advisory committees, or any person under its supervision or control, to inquire into or investigate any membership practices or internal operations of any . . . university fraternity or sorority . . . ." 42 U.S.C. § 1975a(b).  Like Title IX, this exclusion gives legitimacy to the single-sex status of fraternities and sororities.

Considering existing statutes that preserve the single-sex nature of fraternities and sororities and prevent intrusion upon them by the government, CSI's denial of official recognition to the Fraternity in the name of its non-discrimination policy does not justify a violation of the Fraternity's right to intimate association as an organization that promotes congeniality and a supportive social structure for male students.  *See, e.g.*, *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 659, 120 S. Ct. 2446, 147 L. Ed. 2d 554 (2000) (applying strict scrutiny test).  Plaintiffs have thus shown a "clear" or "substantial" likelihood of success on the merits as to their claim of intimate association.  The court grants plaintiffs' motion for a preliminary injunction on this ground and denies defendants' cross-

motion to dismiss.  The preliminary injunction applies to both the non-discrimination policy and CSI's prohibition against rushing and pledging.

### *Expressive Association*

The First Amendment protects the "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends."  *Roberts*, 468 U.S. at 622. This includes a "freedom not to associate," which may be violated when the government "intru[des] into the internal structure or affairs of an association [through] a regulation that forces the group to accept members it does not desire."  *Id*. at 623.  "The forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints."  *Dale*, 530 U.S. at 648.[15]

---

[15] While the present case concerns intrusion on a group's membership, the Court has noted that freedom of expressive association "may take many forms."  *Dale*, 530 U.S. at 648.  Though plaintiffs argue that, under *Healy v. James*, *supra*, the Fraternity has a right to campus recognition, the Court has made clear that *Healy* involved a situation under the freedom of expressive association—not a separate all-encompassing right to recognition.  *See Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 126 S. Ct. 1297, 1312 (2006) ("[T]he freedom of expressive association protects more than just a group's membership decisions.  For example, we have held laws unconstitutional that . . . impose penalties or withhold benefits based on membership in a disfavored group [citing *Healy*, 408 U.S. at 180–84].  Although these laws did not directly interfere with an organization's composition, they made group membership less attractive, raising the same First Amendment concerns about affecting the group's ability to express its message.) (internal citations omitted).

In *Healy*, the group in question, a local chapter of Students for a Democratic Society ("SDS") at Central Connecticut State College ("CCSC"), after filing an application for recognition that complied with CCSC's rules, was denied recognition because the college president feared that SDS was affiliated with a national group known for violence.  *See* 408 U.S. at 183–84 & n.11.  The Court noted that SDS was not challenging the *requirements* for recognition and that "once . . . an application [for official recognition is filed] in conformity with the requirements, the burden [is] upon the College administration to justify its decision of rejection."  *Id*. at 184.  The Court then

In evaluating plaintiffs' claim of expressive association under the First Amendment, the initial inquiry is whether the group engages in "expressive association." *Id*. If so, the court must determine whether the state action "would significantly affect the [group's] ability to advocate public or private viewpoints." *Id*. at 650. Although a group cannot "erect a shield against antidiscrimination laws simply by asserting that mere acceptance of a member from a particular group would impair its message," courts must "give deference to an association's assertions regarding the nature of its expression . . . [and] to an association's view of what would impair its expression." *Id*. at 653. In the last stage, as with evaluating a claim of intimate association, the court applies a strict scrutiny test, assessing whether the state action serves a compelling interest and balancing the state's interest with the burden imposed on the group's associational rights. *See id*. at 657–58; *Louisiana Debating*, 42 F.3d at 1498.

Deciding whether a group is an expressive association involves an analysis of the group's viewpoints, ideals, and activities. The Supreme Court has cautioned: "It is possible to find some

---

proceeded to analyze reasons that would justify an educational institution denying recognition to a student group, namely, (1) a group's known affiliation with an organization with illegal goals and intent to further such illegal goals, *id*. at 186, (2) a group engaging in "advocacy 'directed to inciting or producing imminent lawless action and . . . likely to incite or produce such action,'" *id*. at 188 (quoting *Brandenburg v. Ohio*, 395 U.S. 44, 447 (1969)), and (3) a group's "unwillingness to be bound by reasonable school rules governing conduct," *id*. at 191. The Court emphasized the distinction "between advocacy and action." *Id*. at 189. For example, an educational institution's disagreement with a group's opinions or philosophies is not a valid ground for denying recognition. *See id*. at 187. However, "[a]ssociational activities need not be tolerated where they infringe reasonable campus rules, interrupt classes, or substantially interfere with the opportunity of other students to obtain an education." *Id*. (citing *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 89 S. Ct. 733, 21 L. Ed. 2d 731 (1969)).

*Healy* is very instructive on the relationship between a campus and its student organizations. However, the situation here is not analogous to *Healy*, as plaintiffs are challenging the rules that CSI has imposed and the Fraternity's penalty of non-recognition for not following rules that plaintiffs believe infringe on their associational rights.

kernel of expression in almost every activity a person undertakes—for example, walking down the street or meeting one's friends at a shopping mall—but such a kernel is not sufficient to bring the activity within the protection of the First Amendment." *Stanglin*, 490 U.S. at 25. Nevertheless, it is not necessary that the group be devoted to advocacy, *Dale*, 530 U.S. at 648, or taking public stances, *Duarte*, 481 U.S. at 548. Indeed, the nature of the group's expression may be private, and "[t]he fact that the organization does not trumpet its views from the housetops . . . does not mean that its views receive no First Amendment protection." *Dale*, 530 U.S. at 648, 656. Pursuits or activities that may bear on a group's classification as an expressive association include community service, *Duarte*, 481 U.S. at 548; "transmit[ting] . . . a system of values," *Dale*, 530 U.S. at 650; and "civic, charitable, lobbying, [or] fundraising" activities, *Roberts*, 468 U.S. at 627.

In the only case involving whether a fraternity or sorority qualifies as an expressive association, the Third Circuit in *Pi Lambda Phi* held that the fraternity chapter was not an expressive association but admitted that it was "not holding that fraternities *per se* do not engage in constitutionally protected expressive association." 229 F.3d at 444. The Third Circuit further noted: "It is entirely possible that a fraternity (or sorority, or similar group) could make out a successful expressive association claim under the rules laid out in *Stanglin, Roberts,* and *Dale.* We hold only that the University chapter of Pi Lambda Phi has failed to make out such a claim on the record before us." *Id*. at 444–45. The court in *Pi Lambda Phi* based its finding against expressive association on evidence that the fraternity chapter: (1) "[n]ever took a public stance on any issue of public political, social, or cultural importance," (2) had never "done anything to actively pursue the ideals underlying" its connection to the international organization of Pi Lambda Phi, "the country's first non-sectarian fraternity," (3) had never participated in any individual development programs run by

the international Pi Lambda Phi organization, and (4) showed "underwhelming" participation in only "a couple of relatively minor acts of charity." *Id*. at 444.

In contrast to Pi Lambda Phi, the Fraternity in the case at bar has a more clearly articulated expressive identity. The Fraternity expresses itself as a "predominantly Jewish male fraternity" and pursues activities congruent with this identity, including weekly meetings with a Rabbi and once building a sukkah. According to plaintiffs, they plan an average of one community service event per semester, an endeavor that relates to the statement in the Fraternity's bylaws that it "encourage[s] vigorous participation in university, college and general activities in [the] community." (Am. Compl. Ex. 2 pmbl.) Furthermore, the purposes the Fraternity has adopted from AEPi's Constitution—namely, promoting "[p]ersonal perfection, a reverence for God and an honorable life devoted to the ideal of service to all mankind; lasting friendships and the attainment of nobility of action and better understanding among all faiths"—are not so dissimilar from the Boy Scouts' mission "to instill values in young people and . . . to prepare them to make ethical choices over their lifetime in achieving their full potential." *See Dale*, 530 U.S. at 649 (Boy Scouts qualified as expressive association, and New Jersey public accommodations law requiring group to accept homosexual scoutmaster was violation of group's freedom of expressive association). The Fraternity's main pursuit of "brotherhood" is also similar to the Boy Scouts' purposes in *Dale*.

At oral argument, defendants stated that, at this point in the litigation, they do not challenge the Fraternity's classification as an expressive association. (Tr. at 56.) As defendants do not dispute that the Fraternity is an expressive association,[16] and this classification is reasonably supported by

_____

[16] In their memorandum of law, defendants also do not challenge the classification of the Fraternity as an expressive association and, rather, jump immediately to arguing that "[e]ven assuming that the fraternity is an expressive association, it cannot show a substantial likelihood of

principles outlined in cases such as *Dale*, plaintiffs have shown "clear" or "substantial" likelihood

of success on the merits as to this first question.[17]

---

success on its claim that [CSI's] Policies infringe its right to expressive association." (Defs.' Mem. at 19.)

[17] The court is aware of the recent decision in *Christian Legal Soc'y Chapter of Univ. of California v. Kane*, No. C 04-04484, 2006 WL 997217 (N.D. Cal. May 19, 2006), where the court held that *Roberts* and *Dale* were inapplicable to Hastings Law School's denial of official recognition to a chapter of the Christian Legal Society ("CLS"), a group that bars individuals who engage in homosexual conduct or who have religious beliefs different from those approved by CLS, because it violated the law school's non-discrimination policy. *Kane* distinguished *Roberts* and *Dale* on the basis that these cases were limited to situations of "forced inclusion." 2006 WL 997217, at *15.

The court disagrees with *Kane*'s analysis. First, *Roberts* and *Dale* instruct that the initial inquiry in analyzing a claim of expressive association is whether a group qualifies as an expressive association, an analysis that *Kane* did not entertain. *See Dale*, 530 U.S. at 648.

Second, the *Kane* court focused too literally on the idea of forced inclusion as a way of distinguishing *Roberts* and *Dale*. Any group faced with state action or law that must be complied with has a choice between disbanding or continuing to operate by adjusting itself to comply with the state action or law. From the perspective of a group that insists on its continued existence, such a choice boils down to "forced inclusion." In *Roberts*, Jaycees had a choice between disbanding or complying with the Minnesota Department of Human Rights' order to cease and desist from discriminating on the basis of gender in its membership practices. *See* 468 U.S. at 615–16. In *Dale*, the Boy Scouts had a choice to disband or comply with the New Jersey public accommodations law. *See* 530 U.S. at 646–47. Here, the Fraternity faces the choice to remain unrecognized by the CSI campus or adjust its membership policies to include women. The fact that the Fraternity is not faced with having to disband altogether does not make the instant matter distinguishable, as the Fraternity has the equivalent of a disbanded status with respect to the environment in which is seeks to exist and with respect to the environment responsible for the state action, i.e., CSI. Jaycees and the Boy Scouts were subject to state laws that were more far-reaching geographically than the CSI campus policies.

For these reasons, the court disagrees with *Kane*'s distinction that "Hastings is not directly ordering CLS to admit certain students. Rather, Hastings has merely placed conditions on using aspects of its campus as a forum and providing subsidies to organizations." 2006 WL 997217, at *16. *Roberts* and *Dale* are applicable to the instant case and in analyzing whether the Fraternity qualifies as an expressive association.

This court's disagreement with *Kane* is consistent with another recent decision, *Christian Legal Soc'y v. Walker*, 453 F.3d 853 (7th Cir. 2006). In *Walker*, where the Southern Illinois University School of Law ("SIU") revoked the official recognition of its CLS chapter, the Seventh Circuit analyzed the situation under *Roberts* and *Dale* and noted that "SIU's enforcement of its antidiscrimination policy upon penalty of derecognition can only be understood as intended to induce CLS to alter its membership standards." 453 F.3d at 863. The court found that SIU's non-

The next inquiry is whether CSI's state action "would significantly affect the [Fraternity's] ability to advocate public or private viewpoints." *See Dale*, 530 U.S. at 650. Defendants argue that the Fraternity's expressive activity would not be burdened by inclusion of women members.

Most of the Fraternity's pursuits and ideals are the kind that the Court has found would not be significantly affected by the inclusion of women. For example, with regard to community service and participation in community and campus events, in *Duarte* the Court noted that admitting women "does not require [the Rotary Clubs] to abandon their basic goals of humanitarian service, high ethical standards in all vocations, good will, and peace." 481 U.S. at 548. The Court in *Duarte* also suggested that, rather than thwarting the Rotary Clubs' purposes, admitting women would actually further the Rotary Clubs' goal of reflecting a "cross section of community leaders." *Id.* at 548–49. In light of characterizing the infringement of Rotary members' expressive association as "slight," the Court found that this burden was justified by the compelling interest in eliminating discrimination provided by California's Unruh Civil Rights Act. *Id.* at 549.

In *Roberts*, the Court found that, though Jaycees members "regularly engage in a variety of civic, charitable, lobbying, fundraising, and other activities worthy of constitutional protection under the First Amendment," there was

> no basis in the record for concluding that admission of women as full voting members will impede the organization's ability to engage in these protected activities or to disseminate its preferred views. The Act requires no change in the Jaycees' creed of promoting the interests of young men, and it imposes no restrictions on the organization's ability to exclude individuals with ideologies or philosophies different from those of its existing members. Moreover, the Jaycees already invites women to share the group's views and philosophy and to participate in much of its training

discrimination policy burdened CLS's "ability to express its ideas" because "forcing [CLS] to accept as members those who engage in or approve of homosexual conduct would cause the group as it currently identifies itself to cease to exist." *Id.*

31

and community activities.  Accordingly, any claim that admission of women as full voting members will impair a symbolic message conveyed by the very fact that women are not permitted to vote is attenuated at best.

468 U.S. at 626–27 (internal citation omitted).  Thus, weighed against Minnesota's compelling state interest in "eliminating discrimination and assuring its citizens equal access to publicly available goods and services," the Court found that Jaycees failed to demonstrate a serious burden on its right to expressive association.  *Id.* at 623–24; 628.

With regard to the Fraternity's dedication to promoting Jewish culture, plaintiffs have not explained why women would significantly affect the Fraternity's ability to engage in such expression.  Indeed, as pointed out by defendants at oral argument, as the Fraternity does not discriminate on the basis of faith and welcomes all men who are comfortable with belonging to a group affiliated with Jewish culture, it is difficult to believe how a woman, whether Jewish or not, would not be able to hold the same appreciation for Jewish culture.

Another pursuit named by the Fraternity is the notion of "brotherhood."  According to descriptions given by Mr. Khaychuk, "brotherhood," which shares at least some aspects with a family relationship, is only achievable between males.  In part, it is achievable because the risk of romantic relations does not exist as with females; however, this is not the whole story, as Mr. Khaychuk testified that brotherhood is not necessarily extinguished where a homosexual or bisexual male is concerned, nor can it exist between a male and a lesbian.

Amici North-American Interfraternity Conference ("NIC") and National Panhellenic Conference ("NPC"), in their memorandum, also place importance on the notion of "brotherhood," as well as on its counterpart, "sisterhood":

Fraternities and sororities have existed as single-sex organizations for over 200 years

on North-American college and university campuses. Many Greek organizations nationwide provide housing for their members. The forced inclusion of all students would destroy the Greek system as it has successfully existed as part of campus life.

Male fraternal organizations generally seek to establish brotherhood and the deep bonds associated with brotherhood; female fraternal organizations likewise seek to establish sisterhood and the deep bonds associated therewith. The forced inclusion of females into all-male organizations and the forced inclusion of males into all-female organizations would destroy the development of brotherhood and sisterhood at the NIC and NPC organizations.

(Amici Mem. at 14–15.)

At oral argument, defendants labeled "brotherhood" as plaintiffs' strongest argument for expressive association status, describing it straightforwardly: "[W]e are obviously a group of men who believe in the value of a group of men. So if you stick a woman into this picture, something will not feel right. Her very presence, mere presence, will take away the force of the message." (Tr. at 61.) Yet defendants argue that such a message has not been well-articulated by the Fraternity. This may be because the Fraternity's notion of "brotherhood" is simply difficult to articulate, as evidenced by Mr. Khaychuk's inability to fully describe the term and its meaning to the Fraternity.

At the same time, the Court in *Roberts* at least hinted that a men-for-the-sake-of-men's organization does not fall under the protection of freedom of expressive association. In response to Jaycees' argument that allowing women to vote might change the message communicated by the group, as women might have different opinions than men regarding issues such as the federal budget or foreign relations, the Court responded that Jaycees was relying "solely on unsupported generalizations about the relative interests and perspectives of men and women" and further explained as follows:

Although such generalizations may or may not have a statistical basis in fact with respect to particular positions adopted by the Jaycees, we have repeatedly condemned

> legal decisionmaking that relies uncritically on such assumptions. In the absence of a showing far more substantial than that attempted by the Jaycees, we decline to indulge in the sexual stereotyping that underlies appellee's contention that, by allowing women to vote, application of the Minnesota Act will change the content or impact of the organization's speech.

468 U.S. at 628 (internal citations omitted). In *Duarte*, there was testimony that the Rotary Clubs excluded women from membership for reasons of "fellowship . . . enjoyed by the . . . male membership," 481 U.S. at 541, but the Court did not further explore or describe this purpose, perhaps because it was not as central to the Rotary Clubs as some of the groups' other purposes. The importance the Fraternity gives to "brotherhood" differs from the stereotyping rejected in *Roberts* because it rests not on views about women but on the idea that value can be gained from a community of male-to-male friendships and that plaintiffs want to express themselves as such a group. Viewing the issue this way supports plaintiffs' contention that the inclusion of women would impair the Fraternity's message. Nevertheless, because clouds still surround the idea of "brotherhood," the court does not consider the answer clear at this time.

Another possible crux of the Fraternity's expressive message is one that has been named but not completely elaborated upon—that plaintiffs are part of a "predominantly Jewish male fraternity," a description that suggests that this expressive message is composed of the two inseparable components of (1) appreciating Jewish culture (2) as a male. At this time, however, the record has not been sufficiently developed for the court to determine the effect of admitting women to such a group, whether Jewish or not.

Based on the record before the court, the plaintiffs have not shown a "clear" or "substantial" likelihood of success on the merits that admitting women would significantly affect the Fraternity's expressive purposes. The Fraternity's situation is distinguishable from *Roberts* and *Duarte*,

particularly given the Fraternity's strong assertion of "brotherhood" as a main component of its expressive activity, but not enough for the plaintiffs to satisfy their burden at this time. Plaintiffs' preliminary injunction motion is denied on this ground. However, as can be gleaned from the discussion above, plaintiffs have stated a claim upon which relief may be granted. Therefore, defendants' 12(b)(6) motion is denied with respect to plaintiffs' expressive association claim.

## V. Equal Protection

The requirement in the Fourteenth Amendment that no State shall "deny to any person within its jurisdiction the equal protection of the laws" means that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985). In addition to showing "selective adverse treatment of individuals compared with other similarly situated individuals," *Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005), a plaintiff in establishing an equal protection claim must show that the "selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Id.* (quoting *LeClair v. Saunders*, 627 F.2d 606, 609–10 (2d Cir. 1980)).

While plaintiffs allege that the Fraternity has been treated differently than other student groups that CSI has recognized, defendants counter that the Fraternity is not similarly situated to other recognized student groups, because other groups, including the "Delta Delta Club"[18] and the

---

[18] According to an unofficial CSI website, run by the CSI Computer Club, the purpose of the "Delta Delta Club" is "to create a fellowship amongst college students who will work together in building and achieving lasting friendships and to create a new tradition within the college atmosphere. They accomplish this mission through fundraisers, social gatherings, and open informative lectures on various issues facing today's college student." College of Staten Island,

"Theta Phi Club,"[19] have complied with CSI's non-discrimination policy. The Delta Delta Club is affiliated with national sorority Sigma Delta Tau, which lists it as a chartered chapter as of November 10, 1996. *See* Sigma Delta Tau, http://www.sigmadeltatau.com (last visited August 11, 2006). The Theta Phi Club is affiliated with national sorority Phi Sigma Sigma, which lists it as a chapter. *See* Phi Sigma Sigma, http://phisigmasigma.org (last visited August 11, 2006). Plaintiffs' equal protection claim thus amounts to being treated differently than organizations that have been recognized after complying with CSI's non-discrimination policy. Therefore, plaintiffs fail to allege being treated differently than similarly situated groups.

Plaintiffs also do not allege membership in a protected class. *See Pi Lambda Phi*, 229 F.3d at 447 n.6 ("fraternity membership is not a suspect classification"). Nor have plaintiffs submitted proof that defendants acted maliciously; rather, plaintiffs simply allege that defendants acted "intentionally" and "in bad faith." (Am. Compl. ¶¶ 90–92, 122.) Thus, plaintiffs have neither sufficiently pled their equal protection claim nor shown "clear" or "substantial" likelihood of success on the merits. Defendants' motion to dismiss plaintiffs' equal protection claim is granted, and plaintiffs' motion for a preliminary injunction on this ground is denied.

## VI.    Title IX

As mentioned above, Title IX provides that "[n]o person in the United States shall, on the

---

Clubs and Organizations, http://csistudents.org/clublist (last visited August 11, 2006).

[19] The CSI Computer Club website lists the purpose of the "Theta Phi Club" as "to promote friendship and cooperation among collegians of all races, creeds, and religions; to raise the standard of academic ideals; and to promote philanthropic endeavors. The club achieves its goals through meetings, philanthropic programs, and study groups." *Id*.

basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Plaintiffs argue that, since the Fraternity has been denied campus recognition for being an all-male group, defendants have discriminated against them. Yet plaintiffs clearly allege in their complaint that defendants refused to recognize the Fraternity because it did not comply with CSI's non-discrimination policy. Thus, in arguing that defendants violated Title IX, plaintiffs essentially rely on rephrasing the allegation in their complaint. Plaintiffs turn CSI's stance that the Fraternity shall not discriminate on the basis of sex into meaning that the Fraternity cannot remain all-male. This argument does not work. *See Jones v. Bd. of Ed. of City Sch. Dist. of City of New York*, 632 F. Supp. 1319, 1322 (E.D.N.Y. 1986) (where Board of Education invoked Title IX to require all-female public school to convert into a co-educational institution, and plaintiffs responded by filing suit against Board for violating Title IX, court reasoned: "[T]he issue is whether Title IX prohibits coeducation. Clearly it does no such thing. Title IX forbids discrimination. For plaintiffs to argue that it forbids coeducational schools turns the statute on its head.")

Plaintiffs have not stated a claim upon which relief can be granted under Title IX. Thus, plaintiffs' Title IX claim is dismissed, and plaintiffs' motion for a preliminary injunction on this ground is denied.


## VII.    Qualified Immunity

Plaintiffs assert claims against defendants Springer and Jackson in their individual capacities for both monetary and injunctive relief, and these defendants raise the defense of qualified immunity.

In determining whether qualified immunity applies, the court "must first determine whether

the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Wilson v. Layne*, 526 U.S. 603, 609, 119 S. Ct. 1692, 143 L. Ed. 2d 818 (1999) (quoting *Conn v. Gabbert*, 526 U.S. 286, 290, 119 S. Ct. 1292, 143 L. Ed. 2d 399 (1999)). Here, two viable constitutional claims remain, those of intimate and expressive association. As to whether the rights in this case are clearly established, "[t]he defense applies if reasonable officials would not have understood that their actions, in the instant circumstances, violated plaintiff's right[s]." *Patel v. Searles*, 305 F.3d 130, 138 (2d Cir. 2002). Although the general rights to intimate and expressive association may be "clearly established," under the facts specific to this case, the right of a fraternity to claim these protections is not clearly established. *See id*. Insofar as Springer and Jackson are sued in their individual capacities for the claims of intimate and expressive association, plaintiffs' claims for monetary relief against them are dismissed.

However, qualified immunity does not protect against claims for equitable relief. *Ford v. Reynolds*, 316 F.3d 351, 356 (2d Cir. 2003). Therefore, the claims against Springer and Jackson for equitable relief remain in this case.

## VIII. Conclusion

For the reasons set forth above, the court grants plaintiffs' motion for a preliminary injunction on the basis of their intimate association claim. The preliminary injunction applies to CSI's non-discrimination policy and prohibition against rushing and pledging, and CSI is ordered to grant official recognition to the Fraternity. Plaintiffs' preliminary injunction motion is denied with respect to all other claims. Defendants' cross-motion to dismiss plaintiffs' complaint is granted

with respect to plaintiffs' equal protection and Title IX claims but denied as to the intimate and expressive association claims. The individual capacity claims against Springer and Jackson, for monetary relief only, are dismissed. This matter is referred to the magistrate judge for further discovery and proceedings.

SO ORDERED.

DATED:     Brooklyn, New York
           August 11, 2006

_____/s/_____
                DORA L. IRIZARRY
             United States District Judge